Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/16/2021 08:08 AM CST

Brian Peister, appellant, v.
Channing Eurek, appellee.
___ N.W.2d ___

Filed November 9, 2021.    No. A-21-135.

1. **Judgments: Jurisdiction: Appeal and Error.** When a jurisdictional issue does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect.

2. **Standing: Parent and Child: Child Custody: Visitation.** A party that stands in loco parentis to a minor child has standing to seek custody and visitation regarding that child.

3. **Actions: Standing.** Whether a party who commences an action has standing presents a jurisdictional issue.

4. **Standing: Pleadings: Evidence: Appeal and Error.** When a challenge to a party's standing is raised after the pleadings stage and the trial court holds an evidentiary hearing and reviews evidence outside the pleadings, an appellate court reviews the trial court's factual findings under the clearly erroneous standard. However, the trial court's ruling regarding whether the party has standing is reviewed de novo, because it presents a question of law.

5. **Parent and Child: Words and Phrases.** A person standing in loco parentis to a child is one who has put himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent.

6. **Parent and Child: Intent: Proof.** The assumption of the relationship of in loco parentis is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that relationship.

7. **Parent and Child.** The parental relationship should be found to exist only if the facts and circumstances show that the individual means to take the place of the lawful parent not only in providing support but also with reference to the natural parent's office of educating and instructing and caring for the general welfare of the child.

8. ____. Because in loco parentis status is transitory and not permanent, it may be lost.

Appeal from the District Court for Adams County: Terri S. Harder, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

Jonathan Hendricks, of Dowding, Dowding, Dowding & Urbom, for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## INTRODUCTION

Channing Eurek gave birth to a daughter, Melanie J., in December 2012. Eurek subsequently met and became involved with Brian Peister in late 2013. They lived together for a period of time until August 2016, when their relationship ended. Peister continued to spend time with Melanie until Eurek ended his contact with Melanie in early 2020. Peister filed a complaint alleging to stand in loco parentis to Melanie and requesting parenting time. Following an evidentiary hearing, the Adams County District Court entered an order in which it found that Peister did not stand in loco parentis to Melanie and dismissed his complaint. Peister appeals from that order. We affirm.

## BACKGROUND

### Factual History

Shortly after Melanie's birth in Wayne, Nebraska, in December 2012, Eurek moved with Melanie first to Loup

City, Nebraska, and then in October 2013, the two moved to Kearney, Nebraska. After the move to Kearney, Eurek met Peister, and the two began a relationship in late 2013. In August 2014, the parties moved in together at a location in Kearney along with Melanie and an additional roommate. At the end of their lease in August 2015, the parties moved to a second location in Kearney and continued to live together until August 2016. During this 2-year period of cohabitation, Peister fostered a relationship with Melanie, assisting in her care and supervision outside of daycare hours when neither Eurek nor her parents were able to look after Melanie during evening hours and on weekends. After the move, the parties' relationship began to deteriorate and eventually ended during the first half of 2016. When the parties' lease expired in August 2016, the parties physically separated, and Melanie lived with Eurek.

Following a period of minimal contact, Eurek and Peister eventually reconnected in late 2016 and agreed to remain friends. Despite the end of their romantic relationship, Peister offered to continue to look after Melanie when needed. Eurek accepted Peister's offer, and Peister continued to watch over and spend time with Melanie when Eurek was working and could not have her parents take care of Melanie after daycare and on weekends. Additionally, Peister began sending checks to Eurek in late 2016 to help pay for Melanie's daycare and other expenses.

Eurek moved to Hastings, Nebraska, in January 2018, and Peister also moved to Hastings a few months thereafter. Shortly after moving, Eurek hired a nanny to assist in caring for Melanie during Eurek's 24-hour work shifts, and Peister's time with Melanie decreased as Eurek relied more on the nanny to care for Melanie. In the first half of 2018, Peister stopped sending checks to Eurek for Melanie's daycare. Peister's time with Melanie increased in January 2019, when the hired nanny moved away. Eurek hired a second nanny in February 2019, and Peister's time with Melanie was reduced to watching

her approximately once per week. This arrangement continued until early 2020, when Eurek stopped asking Peister to look after Melanie.

### June 2020 Complaint
### for Parenting Time

On June 8, 2020, Peister filed a "Complaint to Establish Custody and Visitation *in Loco Parentis*" in the district court. Peister's complaint initially named the individual believed to be Melanie's biological father as a defendant, but Peister dismissed this claim after he received notice that this individual was determined not to be Melanie's biological father as part of a separate action. Peister claimed that he had established a parent-child relationship with Melanie such that he stood in loco parentis and asked the district court to award him parenting time with Melanie. In her answer, Eurek argued that Peister did not stand in loco parentis to Melanie and that parenting time with Peister was not in Melanie's best interests.

The district court held a hearing on January 14, 2021. The parties offered exhibits and witness testimony, and Melanie also testified outside the presence of the parties. Additionally, Peister submitted a proposed parenting plan to the court. We now summarize the parties' respective testimonies given at the hearing.

Peister testified that while his relationship with Melanie was initially "just as a friendly figure," he over time "kind of just took the role for" being a father figure to her. He gave examples of how he spent time together with Melanie during the 2 years that he lived with her and Eurek, describing that he and Melanie would "watch TV together, play games together, [and] ride the trike together." He explained that he would watch over Melanie when Eurek was at work, pick Melanie up from daycare or other places, visit his parents with Melanie, and occasionally go on family vacations with Eurek and Melanie during this period. Regarding financial support, Peister recalled that he and Eurek pooled their money together to cover the

cost of necessities for Melanie and had also established a joint bank account concurrent with their consolidation of certain debts. The parties each retained their own separate accounts in addition to this joint account.

After the end of the parties' relationship and their physical separation in August 2016, Peister described that his relationship with Melanie "didn't change much at all" and "[t]he only thing that really changed . . . was that there [were] two households." He stated that he and Eurek coordinated their schedules such that he was taking care of Melanie "at least 40 percent of the time" in the same fashion he had while he lived together with Eurek. Peister testified that he kept a room at his home for Melanie and provided food, clothing, toys, and other items for when she stayed with him. Eurek typically brought Melanie to Peister's home in the evening after Melanie had already eaten and bathed, and Peister confirmed that he would spend around "a half hour to an hour with [Melanie] before bedtime" and some amount of time with her in the morning if she was going to daycare that day. Peister acknowledged that he would occasionally have his roommate or another friend pick up Melanie from daycare and help watch over her if Peister was working. Peister sent several checks to Eurek to help pay for Melanie's daycare from late 2016 until 2018. He affirmed on cross-examination that he stopped sending these payments in 2018 due to his dissatisfaction with the time he was allowed with Melanie. He said that Eurek did not involve him in Melanie's education and health care and that she did not notify him of any related expenses. He nonetheless attended Melanie's dance recitals and soccer games and practices.

Peister also drew attention to comments made by Eurek and Melanie indicating that he was a father figure to Melanie and to his own impressions of his role. Eurek had made several statements to Peister such as "I care about you as [Melanie's] dad." Peister recalled that Melanie would refer to him as "dad" on multiple occasions. He explained that the reason behind his decision to financially support Melanie—even after he and

Eurek separated—was because he felt he "had a father rela-
tionship" with Melanie and that the same feeling led him to
offer to provide for half of Melanie's expenses before he filed
this action.

Conversely, Eurek described Peister's involvement with
Melanie as "nothing outside of what [she] would consider
a friend would do." Eurek testified that Peister had little or
no involvement in parenting functions such as "changing
diapers," "potty training," "[b]athing," "[p]utting Melanie to
bed," "[g]etting up at night with Melanie," and "[g]oing to
[Melanie's] doctor appointments." Eurek "would always stay
home with [Melanie] if she was ill" and "would come home
and take care of" Melanie if she became sick during her over-
night work shifts. Eurek had Melanie attend daycare on week-
days when she worked, and when she had to work weekend
shifts, Melanie spent "probably 95 percent" of those week-
ends with Eurek's parents in Loup City. Peister would watch
Melanie overnight during Eurek's weekday shifts if she "did
not have any other child care when [she] was working during
the week." Eurek testified that Melanie "would always be fed
and bathed and put to bed before [she] had left for work" on
those nights, including "tuck[ing] her in" before Eurek left.
She agreed that Peister "would be responsible if [Melanie]
woke up during the night."

Eurek stated that after the end of the parties' romantic rela-
tionship, Peister "knew he was also [her] last option if [her]
parents could not take care of Melanie." Eurek recalled that
beginning in the summer of 2017, Melanie would spend the
majority of summers with Eurek's parents in Loup City, and
she denied that Peister would have contact with Melanie or
request time with her during the summertime. After she and
Melanie moved to Hastings, Eurek hired a nanny to take care
of Melanie when she was working, and Peister would take care
of Melanie "[m]aybe one day a week." Eurek affirmed that
Melanie would typically have eaten and been bathed before
dropping her off with Peister during this period.

Although Peister's time with Melanie increased after the first nanny hired by Eurek moved in January 2019, Eurek testified that she became aware of issues such as Melanie "not getting to school on time or not being picked up after school or day-care" that coincided with Peister's time with Melanie. Eurek thereafter hired a second nanny in February 2019 to ensure that Melanie would be "getting the stuff that she needs." Eurek testified that Peister was not involved in decisions regarding Melanie's education and health care, noting that he had not been involved with parent-teacher conferences, Melanie's enrollment in a "Head Start" program, meetings regarding Melanie's individualized education program, and Melanie's doctor and dentist appointments. Eurek also stated that although Peister had helped her pay for Melanie's daycare from 2016 until 2018, he did not help her pay for the nannies she hired or Melanie's medical bills, school expenses, and basic necessities. After hiring the second nanny, Eurek characterized Peister as the "last ditch effort" if she "didn't have anybody else to watch" Melanie, which ended in March 2020 when Eurek chose to end Peister's contact with Melanie.

Eurek further explained that at the time of the hearing, she and Melanie had been living together with her current boyfriend, who is the biological father of Eurek's second child. Eurek indicated that Melanie had warmed up to Eurek's boyfriend quickly and "has come around to start calling him dad." She testified that they were presently planning to be married "in the next year" and for him to formally adopt Melanie if they were to get married.

Following the hearing, the district court entered an order on February 4, 2021, dismissing Peister's complaint. After summarizing the testimony given, the court found that Peister did not stand in loco parentis to Melanie. The court stated that Peister made "no claim that he has participated in the significant decisions for Melanie" regarding her "healthcare needs, education, religion, or other matters concerning [her] welfare" and observed that it was Eurek who "made arrangements

for [Melanie's] care" and attended to Melanie's education and health care. The court concluded that while Peister had "watched her, picked her up, played with her, went on some trips with her and paid some of her expenses," Peister had not assumed all obligations incident to the parental relationship with Melanie. The court also found Peister's financial support for Melanie was "minimal" and noted that although Peister originally paid part of Melanie's daycare expenses, he had "paid nothing towards her daycare since the first part of 2018." The court alternatively concluded that if Peister had previously "stood *in loco parentis* [to Melanie] at some time, he lost that standing."

Peister now appeals.

## ASSIGNMENT OF ERROR

Peister claims the district court erred in finding that he did not stand in loco parentis to Melanie.

## STANDARD OF REVIEW

[1] When a jurisdictional issue does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. *Hawley v. Skradski*, 304 Neb. 488, 935 N.W.2d 212 (2019).

## ANALYSIS

### STANDING AND DOCTRINE OF IN LOCO PARENTIS

[2-4] The issue before this court is whether Peister stands in loco parentis to Melanie. A party that stands in loco parentis to a minor child has standing to seek custody and visitation regarding that child. See *Latham v. Schwerdtfeger*, 282 Neb. 121, 802 N.W.2d 66 (2011), *disapproved on other grounds, Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016).

See, also, *In re Guardianship of Brydon P.*, 286 Neb. 661, 838 N.W.2d 262 (2013) (in context of court action in which nonparent seeks custody or visitation with child, in loco parentis is doctrine of standing). Whether a party who commences an action has standing presents a jurisdictional issue. See *Hawley v. Skradski, supra*. When a challenge to a party's standing is raised after the pleadings stage and the trial court holds an evidentiary hearing and reviews evidence outside the pleadings, an appellate court reviews the trial court's factual findings under the clearly erroneous standard. See *id.* However, the trial court's ruling regarding whether the party has standing is reviewed de novo, because it presents a question of law. See *id.*

Here, the parties presented evidence regarding Peister's relationship and involvement with Melanie to the district court at the hearing held on January 14, 2021. Although the issue of Peister's standing was raised in Eurek's answer to his complaint, the evidence considered by the court at this hearing was outside of the parties' pleadings. As such, we review the court's factual findings for clear error, and we review de novo the court's determination that Peister did not have standing under the doctrine of in loco parentis.

## Peister Does Not Stand In Loco Parentis

[5-7] The Nebraska Supreme Court has described the common-law doctrine of in loco parentis as a means "to afford rights to nonparents where the exercise of those rights is in the best interests of the child." *Latham v. Schwerdtfeger*, 282 Neb. at 128, 802 N.W.2d at 72. A person standing in loco parentis to a child is one who has put himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. *Carroll v. Gould*, 308 Neb. 12, 952 N.W.2d 1 (2020).

The assumption of the relationship of in loco parentis is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that relationship. *Id.* The parental relationship should be found to exist only if the facts and circumstances show that the individual means to take the place of a lawful parent not only in providing support but also with reference to the natural parent's office of educating and instructing and caring for the general welfare of the child. *State on behalf of Lilliana L. v. Hugo C.*, 26 Neb. App. 923, 924 N.W.2d 743 (2019).

The Parenting Act, Neb. Rev. Stat. § 43-2920 et seq. (Reissue 2016 & Cum. Supp. 2020), offers guidance as to the obligations that the Legislature has deemed important to the parental relationship. For purposes of the Parenting Act, § 43-2922(17) provides:

Parenting functions means those aspects of the relationship in which a parent or person in the parenting role makes fundamental decisions and performs fundamental functions necessary for the care and development of a child. Parenting functions include, but are not limited to:

(a) Maintaining a safe, stable, consistent, and nurturing relationship with the child;

(b) Attending to the ongoing developmental needs of the child, including feeding, clothing, physical care and grooming, health and medical needs, emotional stability, supervision, and appropriate conflict resolution skills and engaging in other activities appropriate to the healthy development of the child within the social and economic circumstances of the family;

(c) Attending to the adequate education for the child, including remedial or other special education essential to the best interests of the child;

. . . .

(f) Assisting the child in developing skills to maintain safe, positive, and appropriate interpersonal relationships; and

(g) Exercising appropriate support for social, academic, athletic, or other special interests and abilities of the child within the social and economic circumstances of the family.

Despite Peister's claims to have "accepted the responsibilities of a parent—both financial and otherwise," brief for appellant at 13, Peister had a minimal role in fulfilling these parenting functions for Melanie both during the parties' relationship and after their separation. The record indicates that Eurek's work schedule and available sources of care dictated Peister's time with Melanie, and his role primarily entailed playing with her and looking after her for brief periods of time. However, per the parties' testimonies, Peister's involvement as a parental figure in Melanie's education, health, and general care was minimal, and although Peister claimed that Eurek chose not to involve him in these matters, Peister's efforts to become involved were limited. We also note that Peister did not help cover costs associated with Melanie's education and health care, and the limited financial support that he did provide effectively evaporated in 2018 when he voluntarily stopped sending checks to help pay for Melanie's daycare. Only after Eurek cut off his contact with Melanie in early 2020 did Peister offer to pay half of Melanie's expenses.

[8] The record supports the district court's factual findings and its determination that Peister did not establish that he assumed all obligations incident to the parent-child relationship. We likewise conclude that Peister does not stand in loco parentis to Melanie and lacks standing to seek court-ordered parenting time. We also agree with the district court's determination that even if "Peister stood *in loco parentis* at some time, he lost that standing." The court stated it did "not believe Peister ever stood *in loco parentis* to [Melanie] and [had] certainly . . . not done so since early in 2018." Because in loco parentis status is transitory and not permanent, it may be lost. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). Once the person alleged to be in loco parentis no longer

discharges all duties incident to the parental relationship, the person is no longer in loco parentis. *Id*.

## CONCLUSION

For the reasons set forth above, the order of the district court dismissing Peister's complaint is affirmed.

AFFIRMED.